CarVal v. Giddens

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: February 26, 2015               Decided: June 29, 2015)

Docket No. 14-890

_____

IN THE MATTER OF: LEHMAN BROTHERS, INC.,

*Debtor*,

_____

CARVAL UK LIMITED, as manager of CVF Lux Master S.a.r.l., the assignee of Doral Bank and Doral Financial Corporation,

*Claimant-Appellant*,

—v.—

JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman Brothers Inc., SECURITIES INVESTOR PROTECTION CORPORATION,

*Appellees*.[*]

_____

---

[*] On June 25, 2014, Claimant-Appellant Hudson City Savings Bank withdrew its appeal pursuant to Fed. R. App. P. 42(b). The Clerk of Court is directed to amend the caption as set forth above.

B e f o r e:  KATZMANN, *Chief Judge*, WALKER and CHIN, *Circuit Judges*.

_____

The appellant in this case seeks protection under the Securities Investor Protection Act ("SIPA") as a "customer" of the failed broker-dealer Lehman Brothers. The appellant's predecessor entered into a series of repurchase agreements, which involved the sale of securities to Lehman, coupled with an agreement to repurchase the securities back from Lehman at a future date. Before the securities could be repurchased, Lehman failed and entered liquidation under SIPA. We conclude that the appellant is not a customer for purposes of SIPA because our precedents require that a customer must have "entrusted" assets to a failed broker-dealer, and the repurchase agreements did not involve any entrustment of assets to Lehman. We accordingly **AFFIRM** the district court and bankruptcy court orders denying the appellant customer status in Lehman's SIPA liquidation.

_____

LUC A. DESPINS (Bryan R. Kaplan, *on the brief*), Paul Hastings LLP, New York, New York, *for Claimant-Appellant*.

MICHAEL E. SALZMAN (James B. Kobak, Jr., Beatrice Aisha Hamza Bassey, Savvas A. Foukas, Kathleen A. Walker, *on the brief*), Hughes Hubbard & Reed LLP, New York, New York, *for Appellee* James W. Giddens, as Trustee for the SIPA liquidation of Lehman Brothers Inc.

KENNETH J. CAPUTO (Josephine Wang, *on the brief*), Securities Investor Protection Corporation, Washington, D.C., *for Appellee* Securities Investor Protection Corporation

_____

2

KATZMANN, *Chief Judge*:

This case presents the challenging task of fitting a decades-old statute to a financial arrangement of more recent vintage. Enacted in 1970, the Securities Investor Protection Act ("SIPA") seeks to protect investors who have entrusted their assets to a broker-dealer. If the broker-dealer runs into financial trouble, SIPA authorizes the speedy return of investors' property and ensures that investors will be made whole if the assets are lost. In this case, we must consider how SIPA treats an investor who delivered securities to a broker-dealer as part of a now-common financial transaction known as a repurchase agreement. We conclude that an investor who delivers securities to a broker-dealer as part of a repurchase agreement is not protected by SIPA because the investor did not entrust assets to the broker-dealer.

## BACKGROUND

A repurchase agreement—commonly known as a "repo"—involves a matched purchase and sale. First, the "seller" agrees to sell assets, usually

securities, to the "buyer" for a fixed price.[1] Second, the buyer agrees to resell

those same assets back to the seller at a later date and for a slightly higher price—

hence the name "repurchase agreement."

Viewed from the seller's perspective, repos offer a mechanism for

converting idle securities into liquid cash for a limited period. The seller can then

employ that cash for investments or other purposes, before returning the cash to

the buyer in exchange for the securities at the conclusion of the repo. Viewed

from the buyer's perspective, repos provide an outlet for excess cash, and for the

temporary acquisition of attractive securities. Moreover, because the resale price

is higher than the original sale price, the buyer retains the difference—known as

the "repo rate"—as a fee for the transaction. When viewed from a buyer's

perspective, the transaction is called a "reverse repo."

Between January 2000 and May 2001, Doral Bank and Doral Financial

Corporation (collectively, "Doral") entered into six repurchase agreements, with

---

[1] In the species of repo at issue in this case—known as a "bilateral" repo—the seller delivers the assets to the buyer. "Hold-in-custody" repos, by contrast, provide for the seller to maintain custody of the assets in a segregated account, even after selling the assets to the buyer.

Doral as the seller, and Lehman Brothers Inc. ("Lehman") as the buyer.[2] These transactions were governed by industry-standard Master Repurchase Agreements ("MRAs"). Notably, the MRAs describe the relationship between Doral and Lehman as "contractual" and make not mention of a fiduciary relationship. The MRAs gave Lehman full legal title over the underlying securities, and Lehman was free—subject to its obligation to resell the securities on the repurchase date—to sell, transfer, pledge, or hypothecate the securities as it desired. Doral, for its part, received cash in exchange for the securities, and was free to use that cash for its own purposes. Doral also retained an economic interest in the securities, including the rights to receive all principal, interest, dividends, and other distributions. The MRAs protected both Lehman and Doral against changes in the value of the securities by marking the repos to market. If the value of the securities fell, Doral was required to deliver additional securities or cash to Lehman to ensure that the market value of the securities matched the cash held by Doral. Conversely, if the value of the securities rose, Doral could demand additional cash or securities to rebalance the transaction.

---

[2] Again, when viewed from Lehman's perspective, these transactions were "reverse repos."

Under these agreements, Doral sold several hundred million dollars' worth of securities to Lehman, with the expectation that Lehman would resell the securities back to Doral at the conclusion of the transactions. Unfortunately for Doral, the financial crisis struck while the repurchase agreements were still outstanding, and Lehman fell apart before Doral could repurchase the securities from Lehman. Although Doral still had the cash that Lehman paid for the securities, those securities had apparently appreciated in the meantime such that Doral stood to profit if it had repurchased the securities at the agreed-upon price.

After Lehman entered into SIPA liquidation on September 19, 2008, Doral submitted timely claims asserting that it was entitled to recover this profit. The SIPA Trustee denied these claims, concluding that Doral was not a "customer" of Lehman, and therefore was not protected by SIPA. Doral promptly objected to the Trustee's denial, but shortly thereafter transferred its claims to CVF Lux Master S.a.r.l. pursuant to Federal Rule of Bankruptcy Procedure 3001. CVF Lux Master S.a.r.l. is managed by CarVal Investors UK Limited ("CarVal"), the appellant in this case.

On June 25, 2013, the bankruptcy court (Peck, *Bk. J.*) affirmed the Trustee's

determination that the repos did not make Doral or CarVal a customer under

SIPA. *In re Lehman Bros. Inc.*, 492 B.R. 379 (Bankr. S.D.N.Y. 2013). CarVal appealed

the bankruptcy court's decision to the district court. On February 26, 2014, the

district court (Cote, *J.*) affirmed the bankruptcy court. *In re Lehman Bros. Inc.*, 506

B.R. 346 (S.D.N.Y. 2014).

## DISCUSSION

This appeal turns on a single issue: was Doral a "customer" of Lehman for

purposes of SIPA? If Doral was a customer of Lehman, then under SIPA the

appellant is entitled to the prompt return of any property that Lehman was

holding on Doral's behalf—i.e., the securities that Lehman never resold to Doral

as required by the repurchase agreements, less the contractual repurchase price.

Conversely, if Doral was not a customer of Lehman, then the SIPA door is closed,

and the appellant is relegated to pursuing a claim for those unreturned securities

in the ordinary course of Lehman's bankruptcy proceedings. We begin our

analysis of this question by first reviewing the principles articulated by our SIPA

caselaw. We then turn to how these principles treat repurchase agreements. We

conclude by addressing (1) the appellant's reliance on *Matter of Bevill, Bresler & Schulman Asset Mgmt. Corp. (Cohen v. Army Moral Support Fund)*, 67 B.R. 557 (D.N.J. 1986), and (2) the appellant's contention that Congress spoke to the treatment of repos in various statutes enacted since SIPA's passage.[3]

## I. The Securities Investor Protection Act of 1970

Congress enacted SIPA in 1970 in response to "a business contraction [in the securities industry] that led to the failure or instability of a significant number of brokerage firms." *Sec. Investor Prot. Corp. v. Barbour*, 421 U.S. 412, 415 (1975). These failures sent shockwaves through the securities market as investors who had handed their assets over to broker-dealers suddenly lost access to their property. Existing bankruptcy safeguards did not adequately protect investors because investor assets were frequently commingled with the broker-dealer's

---

[3] In addition to its principal arguments, the appellant also asserts in a page and a half that the bankruptcy court committed "reversible error" by declining to accept into evidence a Prime Brokerage Account Agreement that permitted Lehman Brothers to hypothecate the securities of a non-repo claimant who was later treated as a customer in the Lehman Brothers SIPA proceeding. The bankruptcy court declined to admit the agreement, explaining: "I think we should be dealing with the documentation that actually defines a relationship [before the Bankruptcy Court], not documentation that defines somebody else's rights." J.A. 5179. The appellant argues that the bankruptcy court should have admitted the document because "[n]o issues were raised regarding its authenticity" and that it would not have prejudiced the Trustee. Appellant's Br. at 45-46. This argument is without merit. The bankruptcy court did not abuse its discretion in excluding a document it deemed irrelevant to the proceedings before it.

other assets, and thus would be tied up for years in extended bankruptcy proceedings. H.R. Rep. 91-1613, 1970 U.S.C.C.A.N. 5254, 5257. As more and more investors lost access to assets they had previously thought safe, the "situation . . . threatened a 'domino effect' involving otherwise solvent brokers that had substantial open transactions with firms that failed." *Barbour*, 421 U.S. at 415.

SIPA was designed "to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." *Id.* To accomplish these goals, SIPA created special procedures for the liquidation of failed broker-dealers. SIPA trustees administer what is in effect a "bankruptcy within a bankruptcy" for investors who had property on account with the broker-dealer. *See* 15 U.S.C. § 78fff-2. The trustee amasses "customer property" and "[e]ach customer shares ratably in this fund of assets to the extent of the customer's net equity at the time of filing." *In re New Times Sec. Servs., Inc.*, 463 F.3d 125, 127 (2d Cir. 2006) (internal quotations marks and citation omitted). If this fund of customer property is insufficient to make investors whole, the trustee may dip into a special trust fund bankrolled by fees assessed on the community of broker-dealers. This fund is administered by

the Securities Investor Protection Corporation ("SIPC")—one of the appellees in this case—which is a private nonprofit membership organization created by SIPA. *See* S*ec. Investor Prot. Corp. v. Morgan, Kennedy & Co.*, 533 F.2d 1314, 1316 (2d Cir. 1976).

But a claimant only gets these special protections if it is a "customer" of the broker-dealer. SIPA defines a customer as:

> any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral, security, or for purposes of effecting transfer.

15 U.S.C. § 78lll(2)(A). Whether a claimant qualifies as a customer is determined on a transaction-by-transaction basis. *See In re New Times*, 463 F.3d at 127 ("[SIPA] contemplates that a person may be a 'customer' with respect to some of his claims for cash or shares, but not with respect to others.").

Beginning with *SEC v. F. O. Baroff Co.* we have consistently emphasized that to be a customer under this definition, an investor must have "entrusted" property to the broker-dealer. 497 F.2d 280, 283 (2d Cir. 1974). In *Baroff*, the

claimant had lent a substantial quantity of securities to a shaky broker-dealer with the intent of shoring up the broker-dealer's balance sheet. "It was understood that the securities would be returned in a short period of time as soon as [the broker-dealer was] able to straighten out its situation." *Id.* at 281 (internal quotation marks omitted). Before the securities could be returned, however, the broker-dealer failed and entered SIPA liquidation. The claimant sought to get his securities returned, but the trustee denied the claim, finding that the claimant did not qualify as a customer under the statute. *Id.* at 282.

On appeal, we explained that the claimant was not a customer because he never entrusted assets to the broker-dealer. "Both the legislative history of [the definition of 'customer'] and its use since enactment have stressed protection to, and equality of treatment of, the public customer who has entrusted securities to a broker for some purpose connected with participation in the securities markets." *Id.* at 283. The claimant in *Baroff*, by contrast, had lent the securities to the broker-dealer to bolster the broker-dealer's financial situation, rather than to trade on the claimant's own account. Because the securities had not been handed over for the broker-dealer to use for business on the claimant's behalf, the loan lacked "the

11

indicia of the fiduciary relationship between a broker and his public customer."

*Id.* at 284. As such, the claimant was a creditor—in "the situation of a commercial bank, trade creditor, landlord, equipment lessor, or any other party who relies on the ability of a business enterprise to repay a business loan"—rather than a customer of the broker-dealer. *Id.*

In the decades since *Baroff*, our cases have consistently hewed to this entrustment requirement for protection under SIPA. *See, e.g.*, *In re New Times*, 463 F.3d at 128; *Sec. Investor Prot. Corp. v. Exec. Sec. Corp.*, 556 F.2d 98, 99 (2d Cir. 1977) (per curiam). Most recently, in *In re Bernard L. Madoff Investment Securities LLC*, we reaffirmed that the "critical aspect of the 'customer' definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities." 654 F.3d 229, 236 (2d Cir. 2011) (further internal quotation marks and alterations omitted). Several of our sister circuits have also joined us in requiring that a claimant show that it entrusted property to a broker-dealer to qualify as a customer. *See, e.g.*, *In re Brentwood Sec., Inc.*, 925 F.2d 325, 327 (9th Cir. 1991) ("[The] definition [of customer] embodies a common-sense concept: An investor is entitled to compensation from the SIPC only if he has entrusted cash or

securities to a broker-dealer who becomes insolvent . . . ."); *In re Old Naples Sec., Inc.*, 223 F.3d 1296, 1304 (11th Cir. 2000); *Appleton v. First Nat'l Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995); *SEC v. First Sec. Co. of Chi.*, 507 F.2d 417, 420 (7th Cir. 1974).

## II. Entrustment

Recognizing that it must satisfy this entrustment requirement, the appellant contends that repurchase agreements necessarily involve entrustment. The appellant attempts to characterize our entrustment precedents as requiring SIPA claimants to "show that they delivered securities or cash to the broker-dealer 'for some purpose connected with participation in the securities market.'" Appellant's Br. 28 (quoting *Baroff*, 497 F.2d at 283). Doral met this standard, appellant argues, because Doral delivered assets to Lehman when it sold the securities during the first phase of the uncompleted repurchase agreements.

But mere delivery is not entrustment. Entrustment, as contemplated by *Baroff*, must bear "the indicia of the fiduciary relationship between a broker and his public customer." 497 F.2d at 284. This "fiduciary relationship," in turn, arises out of the broker's obligation to handle the customer's assets for the customer's

benefit. *Baroff* offered several examples of behavior that would tend to show that the broker was holding the assets as part of a fiduciary relationship with a customer: (1) selling the assets for the customer; (2) using the assets as collateral to make margin purchases of other securities for the customer; or (3) otherwise using the assets "to facilitate securities trading by" the customer. *Id.* This list of activities, while by no means exhaustive, illustrates what *Baroff* meant when it used the term entrustment: the customer handing assets over to a broker-dealer so that the broker-dealer may do business on the customer's behalf. *See, e.g.*, *Exec. Sec. Corp.*, 556 F.2d at 99; *Appleton*, 62 F.3d at 801.

Under this framework, Doral did not entrust anything to Lehman. Instead, it sold the securities to Lehman, which acquired full legal title. *See* J.A. 479 ¶ 8 (paragraph of the MRAs providing that "[a]ll of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities"). At most, Doral retained a contractual right to repurchase the securities at the

14

conclusion of the repos. *Cf. SEC v. Drysdale Sec. Corp.*, 785 F.2d 38, 41 (2d Cir. 1986) ("The repo merely imposes a contractual obligation to deliver identical securities on the settlement date set by the repo contract.").

In the meantime, however, Lehman owned the securities, and could do what it wanted with them. As the district court correctly found, Doral's repos share many, if not most, of the characteristics that *Baroff* focused on in finding that the claimant there did not entrust securities to his broker-dealer:

> [Lehman] did not sell the Purchased Securities to facilitate further securities trading on behalf of [Doral] or use the Purchased Securities to make margin purchases of further securities on behalf of [Doral]. [Doral] had no reasonable expectation that [Lehman] would sell or use the Purchased Securities in the near future for these purposes on behalf of [Doral]. . . . [Lehman] had acquired title to the Purchased Securities through the Agreements and, as was its right, used the Purchased Securities as collateral or for other repurchase agreements.

*In re Lehman Bros. Inc.*, 506 B.R. at 354. Lehman's discretion to use the securities as it saw fit extended even to situations where Lehman and Doral's interests would become adverse. For example, if at the time of repurchase the securities are worth less than the contractual repurchase price, then Doral's obligation to repurchase would be "out-of-the-money," and completing the sale would inflict a net loss on

Doral; conversely, Lehman would make money on the sale because Doral would repurchase the securities at an above-market price. Rather than being required to act in Doral's interest by, for instance, canceling the repurchase of the securities, Lehman would remain free—indeed, would be contractually obligated—to pursue its own interests by reselling the shares at the contractual repurchase price.

In short, Lehman and Doral were arms-length contractual counterparties, and each entered into the repos for its own benefit. Because Lehman was acting for its own interests, it had no obligation to use the securities on Doral's behalf, and its relationship with Doral thus bore none of "the indicia of the fiduciary relationship between a broker and his public customer." *Baroff*, 497 F.2d at 284. And without these indicia of a fiduciary relationship, we cannot say that Doral entrusted securities to Lehman.

This conclusion aligns us with the Eleventh Circuit, the only other circuit to expressly consider whether repurchase agreements involve entrustment. *In re ESM Gov't Sec., Inc.*, 812 F.2d 1374 (11th Cir. 1987) ("*ESM*"), dealt with a failed

16

reverse repo transaction.[4] The broker-dealer had sold securities to the claimant as part of a repo, but went bankrupt before it could repurchase the securities from the claimant as agreed. *Id.* at 1375. The claimant was left holding the securities, and had to resell them to a third party at a loss; the claimant subsequently filed for protection as a customer. *Id*.

The Eleventh Circuit denied the claimant customer status. Citing *Baroff*, the *ESM* court explained that "it is the act of entrusting the cash to the debtor for the purpose of effecting securities transactions that triggers the customer status provisions." *Id.* at 1376 (alterations omitted). Accordingly, a customer's claim must "bear the indicia of [a] fiduciary relationship" rather than "an ordinary debtor-creditor relationship." *Id.* (internal quotation marks omitted). The Eleventh

---

[4] In *ESM*, the broker was not liquidated under SIPA, but rather under Subchapter III, Chapter 7 of the Bankruptcy Code, which sets forth special provisions for the liquidation of stockbrokers. 812 F.2d at 1375. A stockbroker liquidation under the Bankruptcy Code is similar, but not identical, to a broker-dealer liquidation under SIPA. *See* 7 Collier on Bankruptcy ¶ 740.01 (15th ed.) (comparing and contrasting SIPA with the analogous provisions of the Bankruptcy Code). However, while SIPA and the Bankruptcy Code define customer using almost exactly the same language, *compare* 15 U.S.C. § 78lll(2), *with* 11 U.S.C. § 741(2), we have not yet expressly decided whether *Baroff*'s entrustment requirement extends to the Bankruptcy Code. In *ESM*, the parties did not dispute that the Bankruptcy Code required entrustment, and the Eleventh Circuit's analysis thus proceeded on that assumption. *See* 812 F.2d at 1376. Because *ESM* considered entrustment within the framework set out by *Baroff*, we discuss its application of this framework to repurchase agreements. We do not, however, rely on its broader holding that repo counterparties are not customers under the Bankruptcy Code, as that question is not before us in this SIPA case.

Circuit concluded that the repurchase agreements in that case had no indicia of a fiduciary relationship. The failed broker-dealer "was not holding cash that rightfully belonged to" the claimant. *Id.* The claimant had the right to resell the securities to the broker-dealer for the cash at a later date; until then, "the cash belonged to [the broker-dealer,] not [the claimant]." *Id.* at 1377. As such, the claimant had no fiduciary relationship with the broker-dealer, and there was thus no entrustment.

The Eleventh Circuit's analysis applies with equal force to Doral's repos here. As explained above, Lehman was "not holding [securities] that rightfully belonged to" Doral. Instead, Lehman owned the securities, subject only to its contractual obligation to resell the securities at the end of the repos. Until the repos ended, they continued to belong to Lehman, not Doral. Accordingly, as in *ESM*, Doral's relationship with Lehman did not have the hallmarks of the fiduciary relationship between a customer and its broker-dealer.

The appellant tries to evade this conclusion by invoking Lehman's supposed general fiduciary duty to consummate the repurchase agreement. But, here, the repurchase agreements imposed, at most, a contractual obligation on

18

Lehman to resell the underlying securities back to Doral at the conclusion of the repo. Notably, the appellant does not does not cite a single case holding that a repo counterparty breached a fiduciary duty by failing to resell (or repurchase) securities at the conclusion of a repo. Moreover, even assuming that such a duty existed, it would not be the type of fiduciary relationship described by *Baroff*, in which a broker-dealer holds assets on a customer's behalf.

More generally, the appellant argues that the securities were entrusted because Doral retained a continuing economic interest in the securities even after they were sold to Lehman. The appellant cites several features of the repo transactions to show that Doral had an economic interest in the securities. First, of course, was Doral's expectation that it could repurchase the securities at the conclusion of the repos. According to the appellant, the repurchase agreements were, from Doral's perspective, less a sale of the securities than a temporary parting with assets that remained, fundamentally, its property. Second, Doral's books accounted for the securities as if it still owned them; conversely, Lehman's books did not treat the securities as property of Lehman. *See* J.A. 2128-29, 2757-928. Third, because Doral expected to pay a fixed contract price for the securities

19

when it repurchased them at the end of the repo, Doral, not Lehman, bore the market risk associated with the securities: if the securities rose or fell in value over the course of the repo, Doral would reap the gain or suffer the loss, while Lehman stood to clear the same repo rate no matter what happened to the underlying securities. *See id.* at 3704 ¶ 7; *cf. United States v. Manko*, 979 F.2d 900, 902 (2d Cir. 1992) ("A repurchase agreement may expose the parties to market risk, since the agreed-upon repurchase price may be greater or less than the market price of the [underlying asset] at the agreed-upon date."). Finally, under the MRAs governing the repos, Doral received any principal or interest payments generated by the securities during the course of the repos in the form of regular payments passed on from Lehman. *See* J.A. 458 ¶ 5.

For all these reasons, the appellant contends that Doral retained a significant economic interest in the securities, even though the securities were formally owned by Lehman, and thus that Lehman must have had some obligation to act on Doral's behalf in advancing that interest. In its strongest form, the appellant appears to argue that Doral's continued interest in the securities amounted to "practical ownership" of the securities by Doral, even in the face of

20

Lehman's legal title. On this view, because Lehman possessed something that "belonged" to Doral, Doral must have entrusted the securities to Lehman.

But in this case, the fact that Doral retained economic interests in the securities does not persuade us that Doral entrusted the securities to Lehman. To constitute entrustment, Doral's economic interests must somehow constrain Lehman to use the securities on Doral's behalf, so as to reflect "the indicia of [a] fiduciary relationship between a broker and his public customer." *Baroff*, 497 F.2d at 284. But as explained above, the repos assigned title over the securities to Lehman, and that title carried with it the power to dispose of the securities as Lehman saw fit.[5] Doral's continuing economic interests in the securities did not constrain Lehman's discretion over the securities, much less obligate Lehman to use those securities on Doral's behalf. Lehman's obligation to pass on principal and interest payments to Doral, for example, did not require Lehman to do anything with the securities; rather, the repos simply provided for Lehman to pay Doral an amount equal to the income generated by the securities. Similarly,

---

[5] In fact, one reason that the repo contract awarded title to Lehman was to guard against the eventuality that Doral would breach the repos. In the event of such a breach, Lehman could retain ownership of the securities and thereby minimize its losses. *See* J.A. 461 ¶ 11(d)(i)

21

Lehman's contractual obligation to resell the securities at the conclusion of the repo was akin to a common forward contract requiring Lehman to make a future sale at a fixed price. Nothing about this resale of the security mandated Lehman to act in Doral's interest. Doral's economic interests in the securities, however strong they might have been, thus arose out of Lehman's fixed contractual obligations to Doral—that is, as features of the arms-length deal struck between Doral and Lehman—rather than out of any obligation for Lehman to use the securities on Doral's behalf. As such, those economic interests cannot form a basis for finding that Doral entrusted the securities to Lehman.

In sum, we hold that Lehman's unrestricted ownership of the securities defeats any suggestion that Doral entrusted the securities to Lehman when it entered into the repos. And because Doral did not entrust securities to Lehman, we further conclude that the appellant is not a customer for purposes of SIPA.[6] With this conclusion in mind, we now turn to the appellant's other arguments: (1) that we should follow the "seminal" decision *In re Bevill, Bresler & Schulman Asset*

(providing that, in the event of default by Doral, Lehman could either sell the underlying securities on the open market or retain the securities).

*Mgmt. Corp. (Cohen v. Army Moral Support Fund)*, 67 B.R. 557 (D.N.J. 1986) (hereinafter, "*Bevill, Bresler*"), and (2) that Congress has legislated directly on the treatment of repos under SIPA.

## C. *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.*

The appellant relies heavily on the District of New Jersey's 1986 *Bevill, Bresler* decision, which held that certain repo participants were customers for purposes of SIPA. 67 B.R. at 598-602. Although a decades-old district court decision from another circuit would normally be of limited relevance, *Bevill, Bresler* has proven influential in subsequent courts' analysis of this question. *See, e.g., ESM*, 812 F.2d at 1377 (discussing *Bevill, Bresler*). As such, the bankruptcy court, district court, and parties all devote substantial attention to *Bevill, Bresler*, seeking either to invoke or distinguish its holding. Accordingly, we address *Bevill, Bresler* separately here.

*Bevill, Bresler* arose out of the massive SIPA liquidation of the New Jersey broker-dealer Bevill, Bresler, & Schulman ("BBS") in 1985. BBS entered into numerous repo and reverse repo transactions involving government and agency

---

[6] Our holding is limited to situation where, as here, the claimant delivered cash or assets to a broker-dealer as part of a repo. We need not, and do not, decide how SIPA would treat assets

securities. The transactions were left uncompleted when BBS disintegrated after being charged with fraud by the SEC. BBS's repo counterparties subsequently sought protection as customers under SIPA.

The *Bevill, Bresler* district court found that the repo counterparties qualified as customers. The court began its analysis by concluding that repo counterparties fell within the facial definition of customer set forth in 15 U.S.C. § 78lll(2). The district court then acknowledged, citing *Baroff*, that "[i]t may not be enough, however, merely to satisfy the literal requirements of the SIPA 'customer' definition." *Bevill, Bresler*, 67 B.R. at 600. The district court explained that, for a claimant to be a customer, "the transactions in which they were engaged and which form the basis of their claim of customer status must have been related to investment, trading or participation in the securities market, and [furthermore] the transactions must have arisen out of the type of fiduciary relationship which generally characterizes the relationship between a broker-dealer and its customers." *Id.* (citing *Baroff*, 497 F.2d at 284). The district court reasoned that these factors were "clearly present" in repo transactions, stressing the economic importance of the repo markets, as well as the fact that "[t]he risks and potential

retained by a repo participant as part of a hold-in-custody repo.

rewards associated with repo and reverse repo transactions are unquestionably market-related risks and rewards which are entirely distinct from and additional to any credit risk associated with the solvency of the broker as a financial intermediary." *Id.* at 600-01 (alterations omitted). Accordingly, the district court concluded that BBS's disappointed counterparties were customers under SIPA. The appellant lauds *Bevill, Bresler* as the "seminal case" on the issue of whether repos are protected under SIPA, and urges us to follow it. Appellant's Br. 1-2; *see also id.* at 47-48 (listing cases that cite *Bevill, Bresler*).

*Bevill, Bresler*'s analysis, however, conflicts with our holding in *Baroff.* At bottom, *Bevill, Bresler* never explains how repo participants satisfy *Baroff*'s requirement that a customer must have "entrusted securities to a broker for some purpose connected with participation in the securities markets." *Baroff,* 497 F.2d at 283. Nor does *Bevill, Bresler* explain how BBS's repo counterparties shared a relationship with BBS that had "the indicia of the fiduciary relationship between a broker and his public customer." *Id.* at 284. Instead, *Bevill, Bresler* only uses the word "fiduciary" a single time, when explaining *Baroff*, and then never returns to the concept of a fiduciary relationship.

And while *Bevill, Bresler* strives to distinguish repo participants from the claimant in *Baroff*, this effort is unsuccessful. *Bevill, Bresler* reasons that "[u]nlike the stock lender in *Baroff*, the repo and reverse repo participants in the BBS, Inc. test cases were not contributing 'to the capital of the broker-dealer.'" 67 B.R. at 602 (quoting *Baroff*, 497 F.2d at 284). But this is a distinction without a difference: *Bevill, Bresler* does not explain why "contributing to . . . capital" should bear on whether the repo participant entrusted securities to the failed broker-dealer. Although contributing capital to a failed broker-dealer may be one way to deliver assets to a broker-dealer without entrusting those assets as required by SIPA, that does not mean there are not many other ways to deliver assets without entrusting them—here, by selling those assets to a broker-dealer as part of a repo.

In short, although *Bevill, Bresler* acknowledges *Baroff* and our other entrustment precedents, the decision does not actually demonstrate how repo parties entrust assets to failed broker-dealers. Accordingly, we find *Bevill, Bresler* to be inconsistent with our caselaw, and decline to follow it here.

**D. Subsequent Legislative Activity**

Finally, the appellant moves beyond entrustment, contending that Congress has settled the question of how repos should be treated under SIPA. First, the appellant argues that by not specifically excluding repo participants from the customer definition, Congress implicitly confirmed that repos fall within the protection of SIPA. Congress specifically amended SIPA in 1978 to exclude certain types of securities lending, but never passed a similar exclusion for repos. *See* Securities Investor Protection Act Amendments of 1978, Pub. L. No. 95-283, § 15. Invoking the well-known canon of *expressio unius est exclusio alterius*—"the express mention of one excludes the other"—the appellant reasons that Congress must have intended not to exclude repos from SIPA.

This argument fails for exactly the reason stated by the district court: Doral has "failed to identify any basis to conclude that, in 1978, Congress was considering repurchase agreements, or that securities lending and repurchase agreements necessarily go hand in hand." *In re Lehman Bros. Inc.*, 506 B.R. at 357. "[E]xpressio unius . . . does not apply 'unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it.'" *Marx v. Gen.*

*Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003)).[7]

The appellant next argues that when Congress enacted the Dodd-Frank financial reform bill, it considered expressly excluding repos from customer protection under SIPA, but ultimately decided against enacting an express exclusion. The appellant cites a version of Dodd-Frank that was passed by the House, and which specifically excluded repos from SIPA. *See* H.R. 4173, 111th Cong. § 7509(b)(1) (as passed by the House, Dec. 11, 2009) ("The term 'customer' does not include . . . (iii) any person to the extent such person has a claim relating to any open repurchase or open reverse repurchase agreement"). The final, enacted version of Dodd-Frank did not include this provision, and instead expressly endorsed the preexisting SIPA definition. *See* Dodd-Frank Wall Street

---

[7] The appellant challenges this conclusion, invoking the presumption that Congress is aware of the existing law against which it legislates. *See, e.g., Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). But when Congress amended SIPA in 1978, there was no existing law against which Congress could legislate. No court considered repos in the context of SIPA until *Bevill, Bresler* in 1986. Instead, the appellant can at best argue that Congress's failure to pass *additional* amendments overriding the result in *Bevill, Bresler* reflects an endorsement of that decision. But, here, congressional inaction is a shaky basis on which to interpret a statute. *Cf. Zuber v. Allen*, 396 U.S. 168, 185-186 n.21 (1969). And even if we were to consider congressional inaction, an isolated district court decision, however "seminal," is hardly a firm baseline against which to read that inaction. If anything, our decision in *Baroff* stands as the baseline, and we should interpret congressional inaction in this area as endorsing *Baroff*'s entrustment requirement.

Reform and Consumer Protection Act, Pub. L. No. 111-203, § 201(a)(10) (2010) ("The term[] 'customer,'. . . in the context of a covered broker or dealer, [has] the same meaning[] as in section 16 of the Securities Investor Protection Act of 1970 (15 U.S.C. 78lll)."). Again, the appellant reasons by negative implication that the failure to enact the express exclusion presented in the earlier version of the bill demonstrates Congress's intent to protect repos under SIPA.

At the outset, we note that Congress enacted Dodd-Frank in 2010, after the SIPA liquidation of Lehman commenced in September 2008. Because customer status is determined as of the SIPA filing date, *see In re New Times*, 463 F.3d at 128, Dodd-Frank cannot make the appellant a customer. But more broadly, that Congress did not enact a specific provision is at best "marginal evidence" that it was rejecting the exclusion of repos from SIPA. *Riverkeeper, Inc. v. U.S. EPA*, 358 F.3d 174, 191 (2d Cir. 2004). This is especially true here, where, in light of *Baroff* and the Eleventh Circuit's decision in *ESM*, Congress may well have rejected the proposed amendment because it thought the amendment was superfluous in light of preexisting law. *See Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) ("Congressional inaction lacks persuasive significance because several

equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (internal quotation marks omitted)). The appellant does not offer any explanation for why Congress rejected the proposed amendment of the customer definition, and the legislative history of Dodd-Frank appears to be silent on the question.

Finally, the appellant points out that Dodd-Frank specifically excluded repos from the definition of customer in the portion of the Bankruptcy Code that governs the liquidation of stockbrokers. *See* 15 U.S.C. § 78c-5(g).[8] As explained above, the Bankruptcy Code adopts a definition of customer that tracks the statutory definition in SIPA. The appellant once more reasons by negative implication that if Congress amended the Bankruptcy Code to exclude repos, but did not similarly amend SIPA, then SIPA must protect repos. But the amendment of the Bankruptcy Code does not supply a sound basis for drawing any inferences about the SIPA provision at issue here. As explained above, SIPA and the

---

[8] We note that the appellant slightly misstates the effect of this provision of Dodd-Frank. Dodd-Frank did not directly amend the Bankruptcy Code's definition of customer. Instead, Dodd-Frank appears to have tacked on a supplemental definition that incorporates and expands upon the Bankruptcy Code's definition of customer, but which only applies in the very specific context of how certain swap transactions are governed under the Securities and Exchange Act. *See* 15 U.S.C. § 78c-5 (section located in Securities and Exchange Act and entitled "Segregation of assets held as collateral in security-based swap transactions").

Bankruptcy Code are two different statutory schemes. Despite the similarities of the customer definition, the Bankruptcy Code lacks many of the other features of SIPA, including most importantly the SIPC trust fund. These dissimilarities, in turn, fatally undermine any attempt to draw inferences about SIPA from Congress's modification of the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, we conclude that the lower courts correctly determined that the appellant is not a customer for purposes of SIPA. Accordingly, we AFFIRM the decisions below.